## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ARA APRAHAMIAN,<br><br>                              Plaintiff,<br><br>          v.<br><br>TEVA PHARMACEUTICALS USA, INC., NISHA PATEL, SANDOZ INC., and HECTOR ARMANDO KELLUM,<br><br>                              Defendants. | **26 Civ. 1168**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff, ARA APRAHAMIAN, ("Plaintiff" or "Mr. Aprahamian"), by and through his attorneys, JON L. NORINSBERG, ESQ., PLLC, brings this Amended Complaint against Defendants TEVA PHARMACEUTICALS USA, INC., ("TEVA"), NISHA PATEL, ("PATEL"), SANDOZ INC., ("SANDOZ"), and HECTOR ARMANDO KELLUM ("KELLUM"), (collectively, "Defendants"), and alleges as follows:

### <u>NATURE OF THE ACTION</u>

1.      This action arises from a criminal prosecution built on fabricated evidence. Defendants Nisha Patel and Hector Armando Kellum knowingly manufactured and supplied federal prosecutors with false allegations of price-fixing and customer-allocation agreements that never occurred. Those deliberate fabrications became the evidentiary core of the case against Plaintiff.

2.      On February 4, 2020, a federal grand jury indicted Plaintiff based largely on that manufactured narrative. There were no recordings, no written agreements, and no independent documentary proof—only the insider account Patel and Kellum constructed and delivered to

1

prosecutors. That fabricated story became the backbone of a prosecution that persisted for nearly four years.

3.    Patel and Kellum did not misunderstand events or misremember conversations. They knowingly lied. Each faced serious criminal exposure and understood that the value of cooperation depended on delivering a viable target to prosecutors.

4.    To secure that protection, they supplied accusations they knew were false—deliberate fabrications designed to trigger charges, fortify the government's case, and secure leniency for themselves.

5.    At the same time, Teva Pharmaceuticals USA, Inc. and Sandoz Inc. were negotiating and later operating under deferred prosecution resolutions with the United States Department of Justice. In that context, meaningful employee cooperation was a central component of the companies' effort to resolve their own criminal exposure.

6.    Upon information and belief, Teva financed and supported Patel's cooperation, including payment of her legal fees and indemnification, and Sandoz likewise financed and supported Kellum's cooperation on the same terms. That support was not incidental; it advanced each company's core corporate objectives and was leveraged as part of their respective negotiated cooperation posture with the government.

7.    The government's case depended on Patel and Kellum. As the prosecution unfolded, their accounts were exposed as internally inconsistent, materially contradictory, and diametrically different over time. Faced with irreconcilable stories and mounting impeachment material, the evidentiary foundation of the case collapsed.

8.    On November 29, 2023, the Court dismissed the indictment with prejudice, terminating the criminal case in Plaintiff's favor.

9.     Plaintiff maintained his innocence throughout and refused to plead guilty because he did not commit the crimes alleged.

10.     The consequences were severe and lasting. Plaintiff lost his executive career in the pharmaceutical industry, suffered significant reputational harm and sustained extraordinary economic damages.

11.     This action seeks redress for the fabrication of evidence that initiated and sustained the criminal prosecution and for the continuation of proceedings without probable cause, including corporate responsibility for misconduct carried out and reinforced through the companies' cooperation posture and formal adoption of the false narrative.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between Plaintiff and Defendants and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

13.     This Court also has subject matter jurisdiction under 28 U.S.C. § 1331 because Plaintiff's claims also arise under federal law. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

14.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Plaintiff's claims occurred within this District, including Plaintiff's indictment by a grand jury in this District and the criminal proceedings conducted in this District.

## JURY DEMAND

15.     Plaintiff demands a trial by jury on all issues so triable.

## PARTIES

16.    Plaintiff Ara Aprahamian is a resident of New York and a registered pharmacist with more than thirty years of experience in the pharmaceutical industry. From March 2013 through August 2018, he served as Vice President of Sales and Marketing at Taro Pharmaceuticals U.S.A., Inc., a generic pharmaceutical manufacturer.

17.    Defendant Teva Pharmaceuticals USA, Inc. is a Delaware corporation with its principal place of business in Parsippany, New Jersey.

18.    Defendant Nisha Patel is a resident of Collegeville, Pennsylvania. She served as a senior executive at Teva Pharmaceuticals USA, Inc., including as Director of Strategic Customer Marketing and Director of National Accounts, during the period relevant to the allegations at issue in the criminal case.

19.    Prior to Plaintiff's indictment, Patel was deeply involved in communications with federal authorities concerning alleged industry conduct. During the criminal proceedings, she served as a key cooperating witness against Plaintiff and was identified as "CW-4."

20.    Patel's cooperation was closely aligned with Teva's interests throughout the criminal investigation and prosecution, including during Teva's negotiations and performance under its Deferred Prosecution Agreement.

21.    Defendant Sandoz Inc. is a Colorado corporation with its principal place of business in Princeton, New Jersey.

22.    Defendant Hector Armando Kellum is a resident of Huntingdon Valley, Pennsylvania. At all relevant times, he was employed by Sandoz Inc. as Senior Director of Pricing and Contracts and later Vice President of Contracting and Business Analytics.

23.    In the criminal indictment against Plaintiff, Kellum was identified as "CW-3." On February 14, 2020, he pleaded guilty to conspiracy to restrain trade under 15 U.S.C. § 1.

24.    Kellum's cooperation was closely aligned with Sandoz's interests throughout the criminal investigation and prosecution, including during Sandoz's negotiations and performance under its Deferred Prosecution Agreement.

**Plaintiff's Professional Background and Credentials**

25.    Plaintiff Ara Aprahamian is a registered pharmacist with a Bachelor of Science in Pharmacy from St. John's School of Pharmacy, where he earned Dean's List honors.

26.    Plaintiff has over thirty years of progressively responsible experience in the pharmaceutical industry, demonstrating exceptional expertise in pharmaceutical sales, contracting, marketing, managed care, pricing, portfolio management, purchasing, and operations.

27.    From 1992 to 2002, Plaintiff worked at National Prescription Administrators/CFI, rising to Assistant Vice President of Pharmaceutical Contracting/Purchasing with direct supervisory responsibility for two mail order facilities dispensing over 70,000 prescriptions per week. Through strong administration of contracts, he was instrumental in annual savings in excess of $3 million.

28.    From 2002 to 2005, Plaintiff served as Director of Strategic Purchasing at AmerisourceBergen, one of the leading pharmaceutical wholesalers in the country.

29.    From 2005 to 2010, Plaintiff served as Director of Manufacturer Contracting at Pharmacy First, L.L.C., working directly with pharmaceutical manufacturers to develop, contract, market, and implement various marketing programs for a network of 4,000 participating pharmacies.

30.     From 2010 to 2013, Plaintiff served as Director of Pricing & Contracts at Actavis Inc., where he was responsible for directing the department that established, monitored, and maintained pricing for their entire portfolio of generic pharmaceuticals. He generated in excess of $40 million in price increases in 2011 through his strong understanding of the competitive landscape.

31.     From March 2013 to August 2018, Plaintiff served as Vice President of Sales and Marketing at Taro Pharmaceuticals. In this capacity, Plaintiff had overall oversight for sales and marketing, and was responsible for developing and building relationships and growth strategies with key accounts.

32.     At Taro, Plaintiff generated more than $100 million annually through strategic price optimization based on market analysis and industry trends. He led integration efforts for major Group Purchasing Organization ("GPO") and customer consolidations and identified and relaunched five high-margin products, driving significant revenue growth.

33.     Plaintiff's extensive industry knowledge, expertise, and professional reputation made him a visible figure in the generic pharmaceutical industry.

## FACTUAL ALLEGATIONS

**The Government Investigation into the Generic Pharmaceutical Industry**

34.     Beginning in or about 2014, the United States Department of Justice initiated a broad criminal investigation into alleged price-fixing conduct in the generic pharmaceutical industry.

35.     By 2019, both Teva and Sandoz faced potential criminal prosecution. During 2018 and 2019, Teva and Sandoz engaged in negotiations with the Department of Justice to resolve their criminal exposure through Deferred Prosecution Agreements ("DPAs") or similar resolutions.

36.    In negotiating those resolutions, both companies understood that meaningful employee cooperation would be a critical factor in securing favorable terms, including reduced penalties and avoidance of corporate convictions.

37.    A criminal conviction for certain offenses can trigger mandatory exclusion from participation in federal healthcare programs under 42 U.S.C. § 1320a-7 for a minimum period of five years.

38.    Generic pharmaceutical manufacturers derive substantial revenue from Medicare, Medicaid, Veterans Affairs programs, and other federally funded healthcare programs. Loss of eligibility to participate in those programs would have significant financial consequences.

39.    Avoiding corporate convictions and the risk of mandatory exclusion under 42 U.S.C. § 1320a-7 was therefore a central consideration during the DPA negotiations.

40.    Although the DPAs were formally executed on March 2, 2020 (Sandoz) and August 21, 2023 (Teva), both companies were actively engaged in settlement negotiations and operating in full cooperation postures with the Department of Justice during 2018 and 2019, providing access to employees and information in anticipation of formal resolution.

**Sandoz and Teva Enter into Deferred Prosecution Agreements**

41.    On March 2, 2020, Sandoz entered into a Deferred Prosecution Agreement with the Antitrust Division of the United States Department of Justice and agreed to pay a $195 million criminal penalty.

42.    On August 21, 2023, Teva entered into a Deferred Prosecution Agreement with the Antitrust Division of the United States Department of Justice and agreed to pay a $225 million criminal penalty.

43.     The DPAs required ongoing cooperation, including assisting in investigations and prosecutions and making employees and former employees available for interviews and testimony.

44.     The agreements required the companies to use best efforts to secure the cooperation of designated "Covered Individuals" and included provisions under which such individuals could receive protection from prosecution for qualifying conduct, provided they satisfied cooperation requirements.

45.     To qualify as a "Covered Individual," a person had to have been employed by the company at the time of the conduct at issue and to have acted within the scope of corporate responsibilities.

46.     Upon information and belief, Patel and Kellum were treated as "Covered Individuals" for purposes of their respective companies' cooperation obligations, and their continued protection from prosecution depended upon providing cooperation deemed satisfactory by the government.

47.     Upon information and belief, Teva funded the legal representation of Patel and provided indemnification in connection with the investigation and related proceedings.

48.     Upon information and belief, Sandoz funded the legal representation of Kellum and provided indemnification in connection with the investigation and related proceedings.

49.     Patel and Kellum understood that their cooperation bore directly on both their own criminal exposure and their employers' ability to demonstrate compliance with cooperation expectations during negotiations and under the DPAs.

50.      Their protection from prosecution depended on providing cooperation to the government. Failure to comply fully with cooperation obligations could void that protection and expose the individual to criminal prosecution.

51.    Patel and Kellum understood that the perceived value of their cooperation depended on providing incriminating testimony against higher-level targets such as Plaintiff.

52.    If Patel or Kellum had acknowledged they had no incriminating information about Plaintiff, they risked being viewed as failing to provide meaningful cooperation and losing the protection of the agreements.

53.    Patel and Kellum therefore made a deliberate decision to falsely implicate Plaintiff and provide fabricated claims to increase their value as cooperating witnesses and preserve their own protection from prosecution.

54.    In doing so, they were acting within the scope of their employment and at least in part in furtherance of their employers' interests, including assisting their employers in negotiations with prosecutors before the DPAs, satisfying their employers' cooperation obligations under the Deferred Prosecution Agreements after the DPAs were executed, and preserving the benefits of those agreements throughout the nearly four-year criminal prosecution, most critically including avoidance of mandatory exclusion from federal healthcare programs.

55.    Teva and Sandoz are therefore vicariously liable for the tortious conduct of their employees Patel and Kellum, including their deliberate fabrication of evidence, their knowing provision of false testimony, their corruption of the investigative process, and their malicious prosecution of Plaintiff in both criminal and civil proceedings.

56.    The criminal prosecution of Mr. Aprahamian continued for three years and nine months after Sandoz entered into its DPA in March 2020. Throughout this extended period, Patel and Kellum maintained their false testimony, knowing that their continued cooperation was essential both to their own immunity agreements and to their employers' ongoing compliance with

the DPAs' cooperation requirements and to their employers' continued avoidance of mandatory exclusion from federal healthcare programs.

**The Reality: Lawful Market Information, Taro's Controls, and the Absence of Any Agreement**

57.    Patel and Kellum did not merely exaggerate or embellish, they fabricated a conspiracy that could not have possibly existed. To understand why their allegations are economically and operationally impossible, it is necessary to examine the objective market structure, transparent pricing framework, and multilayered internal controls that actually governed Taro's conduct during the relevant period.

58.    Like all legitimate participants in the generic pharmaceutical industry, Taro made pricing and bidding decisions based on objective, widely used market reference sources, not competitor agreements.

59.    At the time relevant to these events, the principal industry data platform was known as Intercontinental Medical Statistics ("IMS"). IMS has since become part of IQVIA, but during the relevant period it was universally referred to in the industry simply as "IMS."

60.    IMS data was the industry-standard platform used to track product sales, competitive activity, market share, and pricing trends across generic pharmaceutical markets.

61.    Manufacturers throughout the industry, including Taro, Teva, and Sandoz, relied on IMS data to evaluate competitive conditions and inform independent business decisions.

62.    At Taro, Plaintiff and his team relied heavily on IMS data to assess competitor counts, market share performance, and customer dynamics, including whether and how to respond to customer requests for proposals.

63.    Industry participants also relied on Wholesale Acquisition Cost ("WAC") benchmarks published in widely available compendia such as Medi-Span and Gold Standard. These benchmarks were transparent, standardized, and accessible across the industry.

64.    WAC benchmarks reflected identical reference information for all manufacturers and were not proprietary information exchanged between competitors.

65.    Market pricing could be readily inferred, approximated, or validated using publicly available WAC benchmarks, IMS data, and customer-provided market intelligence, without any unlawful agreement.

66.    Taro's pricing decisions were not made unilaterally by Plaintiff. While Plaintiff had authority to negotiate pricing for individual customer accounts, any industry-wide pricing action affecting Taro's entire customer base required multiple layers of internal review and approval, including senior executives above Plaintiff.

67.    Further, pricing actions at Taro were not implemented by a single executive in isolation. They required internal pricing analyses, documented proposals, and multiple layers of review and approval by senior management. That structure left no realistic pathway for covert, unilateral "coordination" by Plaintiff with a competitor outside Taro's internal process.

68.    Most importantly, pricing decisions were driven by analytics and structured decision frameworks, including competitor count, historical pricing data, market-share analysis, and reference-brand pricing, not by alleged coordination with competitors.

69.    These internal controls made covert, unilateral "conspiracy pricing" by Plaintiff not merely unlikely, but impossible.

70.    When Plaintiff communicated with industry contacts, such as Patel, those communications were routine and lawful and did not involve agreements regarding future pricing, bids, customer allocation, product launches, or coordinated conduct.

71.    Plaintiff did not provide, nor could he provide, Patel, Kellum, or any other employee at Teva or Sandoz for that matter, with any Taro pricing, strategy, bid information, customer allocation plans, or advance notice of future pricing decisions.

72.    Any pricing information discussed in the marketplace was already discernible through customers, reflected in published WAC benchmarks, or observable through IMS market data.

73.    Customers routinely conveyed competitive pricing information to manufacturers, and competitors could and did learn pricing through customers and standard market intelligence.

74.    There was no agreement, written, oral, tacit, or inferred, between Plaintiff and Patel, Kellum, or any other employee at Teva or Sandoz regarding prices, bids, customers, product launches, or market allocation.

75.    Plaintiff never entered into any conspiracy to restrain trade, fix prices, allocate customers, or rig bids, period.

76.    The allegations advanced by Patel and Kellum depend on a fictional premise: that Plaintiff secretly coordinated non-public pricing outside Taro's structured approval system and outside the industry's transparent data environment.

77.    That premise is patently false. There were no such agreements. There was no coordination. There was no conspiracy.

78.    If the alleged multi-year conspiracy described by Patel and Kellum had actually existed, it would have generated some contemporaneous trace, internal pricing submissions,

calendar entries, travel or meeting records, customer-side documentation, or communications reflecting coordination. No such evidence exists. The absence of any such footprint underscores that the agreements they described were fabricated.

## THE TEVA and PATEL ALLEGATIONS

### Patel's Corporate Role and the Scope of Her Testimony

79.    Nisha Patel served as a senior executive at Teva Pharmaceuticals USA, Inc., including as Director of Strategic Customer Marketing and Director of National Accounts, during the period relevant to the allegations at issue in the criminal case.

80.    In that role, Patel obtained knowledge concerning Teva's pricing practices, customer relationships, competitive positioning, and internal operations solely through her corporate employment.

81.    Every allegation Patel later provided to federal authorities concerned conduct that allegedly occurred during her tenure at Teva and involved information she acquired through her corporate position.

82.    Her testimony did not concern events outside the scope of her work at Teva or information obtained independently of her employment.

83.    During the government's investigation and prosecution, Patel met with federal prosecutors at least twenty times and served as a key cooperating witness against Plaintiff.

84.    Patel has asserted that she was ordered by a court to appear and provide testimony in connection with the government's investigation.

85.    However, even assuming, underguendo, that Patel's appearance was compelled, no court order required her to provide false statements.

13

86.    Patel's decision to fabricate testimony was entirely voluntary and was driven by her own self-interest in securing immunity, avoiding prison, and protecting herself from civil liability, as well as by her aligned interest in advancing Teva's corporate objectives in securing favorable DPA terms and avoiding mandatory exclusion from federal healthcare programs.

87.    Patel made a calculated decision to fabricate detailed accusations, manufacture specific false claims about adapalene, clotrimazole, and etodolac, and provide prosecutors with the incriminating testimony they sought, not because those accusations were true, but because fabricating them served her personal interests and Teva's corporate interests in avoiding mandatory exclusion from government contracts.

88.    These statements were made while Patel was serving as a cooperating witness in connection with Teva's efforts to resolve and comply with federal antitrust investigations.

**Teva's Continued Financial and Legal Interest in Patel's Cooperation Despite Terminated Employment**

89.    Although Patel was no longer a formal employee of Teva when she began cooperating with federal authorities in 2019, Teva maintained substantial financial and legal interests in her cooperation and continued to support her throughout the investigation, criminal prosecution, and civil proceedings.

90.    Upon information and belief, Teva agreed to defend and indemnify Patel in connection with the federal investigation and any related proceedings.

91.    Upon information and belief, Teva retained separate outside counsel to represent Patel's interests in connection with the investigation and related proceedings.

92.    Upon information and belief, Teva paid the legal fees and expenses for Patel's counsel throughout the investigation, Plaintiff's criminal prosecution, related civil proceedings, and all related matters.

93.    Upon information and belief, Teva provided Patel with indemnification protection against potential monetary penalties, civil liability, and other financial consequences arising from the investigation.

94.    This financial arrangement created a direct and substantial economic relationship between Teva and Patel that continued long after her formal employment ended.

95.    By funding Patel's legal defense and providing indemnification, Teva made a corporate investment in Patel's cooperation with federal authorities.

**The Complete Alignment of Interests Between Teva and Patel**

96.    As a practical matter, Patel's interests and Teva's interests were completely and inextricably aligned throughout her cooperation, creating a unity of purpose that renders the formal termination of employment irrelevant to the question of vicarious liability.

97.    Patel faced potential criminal prosecution, substantial prison time, and hundreds of millions of dollars in civil liability.

98.    The only pathway to avoid these catastrophic consequences was to provide cooperation that federal prosecutors viewed as valuable and credible.

99.    At the same time, beginning in late 2018 and throughout 2019, Teva was actively negotiating with federal prosecutors to resolve its own imminent criminal prosecution through a deferred prosecution agreement that would avoid mandatory exclusion from federal healthcare programs under 42 U.S.C. § 1320a-7.

100.    During these negotiations, which occurred while Patel was providing her at least 20 interviews to prosecutors, Teva needed to demonstrate that it could deliver meaningful employee cooperation as part of any resolution.

101.    The perceived value and credibility of former employees like Patel directly impacted Teva's negotiating position and the terms it could secure, including the amount of monetary penalties, the scope of required divestitures, the length of the agreement, whether Teva would face full prosecution or a deferred resolution, and most critically, whether Teva would avoid mandatory exclusion from federal healthcare programs under 42 U.S.C. § 1320a-7.

102.    The risk of mandatory exclusion from Medicare, Medicaid, Veterans Affairs, and other federal healthcare programs was the single most important factor driving Teva's willingness to pay $225 million and cooperate extensively. Loss of access to these government contracts would have been financially catastrophic and potentially fatal to Teva's business model as a generic pharmaceutical manufacturer.

103.    After Teva was indicted on August 25, 2020, the stakes for Teva increased exponentially, and Patel's continued cooperation became even more critical to Teva's defense strategy and its ability to negotiate favorable resolution terms that would avoid mandatory exclusion from federal healthcare programs.

104.    After Teva formally entered into its Deferred Prosecution Agreement on August 21, 2023, more than three years into Plaintiff's criminal prosecution, Patel's testimony became expressly referenced in Teva's Statement of Facts as part of the DPA.

105.    Throughout this entire period, from 2019 through November 2023, the more "valuable" Patel appeared to prosecutors, the better Teva's position became in avoiding mandatory exclusion from government contracts.

106.    If Patel had admitted to prosecutors that she had no incriminating information about Plaintiff or that her previous statements were false, it would have undermined Teva's negotiating position during DPA negotiations, weakened the government's case against Teva after its August

2020 indictment, potentially voided any cooperation credit Teva had received, exposed Teva to substantially higher monetary penalties, risked the complete collapse of DPA negotiations and full criminal prosecution of Teva, and most catastrophically, risked mandatory exclusion of Teva from Medicare, Medicaid, Veterans Affairs, and other lucrative federal healthcare programs under 42 U.S.C. § 1320a-7, a result that would have been financially devastating to a pharmaceutical manufacturer and potentially threatened Teva's ability to continue operations.

107.    Conversely, Patel's continued provision of incriminating testimony against Plaintiff directly benefited Teva by demonstrating meaningful employee cooperation during DPA negotiations, providing prosecutors with a "key witness" for the case against Teva, satisfying expectations of valuable cooperation that influenced the terms of Teva's DPA, shifting blame and prosecutorial focus toward individual defendants like Plaintiff, reducing Teva's overall criminal exposure and monetary penalties, and most importantly, avoiding mandatory exclusion from federal healthcare programs that would have threatened Teva's ability to continue operations and would have been financially catastrophic.

108.    Patel fully understood this alignment. She knew that Teva was paying for her legal defense, that her cooperation helped Teva during its negotiations with prosecutors and in avoiding mandatory exclusion from government contracts, that providing valuable testimony enhanced her own protection while simultaneously serving Teva's corporate interests, that any recantation or admission of fabrication would harm both herself and Teva and could trigger Teva's exclusion from government contracts, and that maintaining her false narrative served the mutual interests of both parties.

109.    Although Teva did not formally control Patel's counsel, Teva's payment of her legal fees created substantial influence and ensured that Patel's legal strategy would not conflict with Teva's corporate interests in avoiding mandatory exclusion from federal healthcare programs.

110.    Patel and her counsel understood that Teva was funding the defense, that Teva had negotiated the indemnification arrangement, and that Teva's corporate interests, including its paramount interest in maintaining access to government contracts, were directly tied to the perceived value of Patel's cooperation.

111.    This financial relationship meant that as a practical matter, Patel continued to function in service of Teva's interests despite the formal termination of her employment prior to 2019.

**Teva's Vicarious Liability Under Respondeat Superior**

112.    An employer is liable for tortious conduct committed by its employee or former employee where the conduct concerns matters within the scope of employment and is undertaken, at least in part, to advance the employer's business interests.

113.    Patel's testimony concerned conduct that allegedly occurred during her tenure at Teva and involved information she acquired solely through her corporate role, including pricing strategies, competitive communications, and customer relationships.

114.    The subject matter of Patel's testimony was inseparable from her employment at Teva. She had no independent source of knowledge outside her corporate role.

115.    Teva funded Patel's legal representation and provided indemnification in connection with the government's investigation and prosecution.

116.    Patel's cooperation occurred while Teva was negotiating, and later performing under, a Deferred Prosecution Agreement that required meaningful employee cooperation and access to employee witnesses.

117.    Patel's statements were provided in that context and directly furthered Teva's interests in resolving criminal exposure and satisfying its cooperation obligations.

118.    Teva derived concrete benefit from Patel's cooperation, including credit for employee cooperation and incorporation of her statements into its corporate resolution with the Department of Justice.

**Corporate Adoption and Ratification Through the Deferred Prosecution Agreement**

119.    Teva entered into a Deferred Prosecution Agreement with the Department of Justice on August 21, 2023.

120.    The Statement of Facts accompanying Teva's Deferred Prosecution Agreement includes allegations concerning adapalene, clotrimazole, and etodolac that were drawn from Patel's testimony.

121.    By incorporating those allegations into its formal Statement of Facts, Teva adopted and ratified Patel's account as part of its corporate admission to the government.

122.    Throughout the criminal prosecution of Plaintiff, Patel maintained her accusations.

123.    Teva did not retract, disavow, or correct those accusations, including after civil proceedings revealed contradictions in the narrative reflected in the Deferred Prosecution Agreement.

124.    Patel's cooperation was therefore not independent or rogue conduct. It was conduct connected to Teva's business, financed by Teva, incorporated into Teva's formal admissions, and aligned with Teva's corporate objectives.

**Patel Was a Willing, Voluntary, and Active Participant Who Was the Direct Moving Force Behind the Prosecution.**

125.   Patel was not a passive or reluctant witness. She served as a central cooperating witness in the investigation that led to Plaintiff's indictment.

126.   Patel met with federal prosecutors at least twenty times in connection with the investigation and prosecution.

127.   During those meetings, she provided detailed allegations of unlawful price-fixing, customer allocation, and coordinated conduct involving Plaintiff.

128.   The scope and specificity of Patel's allegations increased over time as her meetings with prosecutors continued.

129.   Patel understood that her cooperation bore directly on her own exposure to criminal liability and on the government's assessment of her value as a cooperating witness.

130.   She further understood that the strength of the case advanced by prosecutors would influence both charging decisions and the benefits she would receive in exchange for cooperation.

131.   Patel's accusations were presented to the grand jury and formed a central component of the narrative supporting Plaintiff's indictment.

132.   Patel understood that her statements would be relied upon in making charging decisions.

133.   Over the course of her repeated meetings, Patel's account evolved and expanded in ways that increasingly implicated Plaintiff in broader alleged conspiratorial conduct.

134.   These expanding narratives were not supported by contemporaneous documents, independent corroboration, or objective evidence.

135.   Patel knew that the alleged agreements she described did not occur.

136.    Despite that knowledge, she repeated and refined those accusations in successive meetings with prosecutors.

137.    Patel's cooperation coincided with her receipt of substantial benefits, including protection from prosecution. She did not serve jail time and did not pay criminal fines.

138.    By falsely implicating Plaintiff, Patel shifted investigative focus away from her own potential liability and toward Plaintiff.

139.    The prosecution of Plaintiff was initiated and sustained based substantially on Patel's repeated accusations.

140.    Without Patel's detailed allegations, there would have been no evidentiary basis to indict Plaintiff.

141.    Patel acted with the intent that her accusations would influence prosecutorial decisions and result in Plaintiff's indictment.

142.    Throughout her cooperation, Patel provided inconsistent and conflicting explanations concerning the alleged scheme.

143.    Those inconsistencies were not the product of refreshed recollection but reflected fabrication rather than the recounting of actual events.

144.    Patel understood that delivering a significant target would enhance the perceived value of her cooperation.

145.    Acting with that understanding, she supplied and maintained accusations she knew were false in order to secure favorable treatment for herself.

146.    Her conduct went beyond responding to isolated questions. She participated extensively in shaping the account of alleged conduct presented to prosecutors.

147.    Patel's false accusations were the direct moving force behind the initiation and continuation of the criminal prosecution against Plaintiff.

**Patel Procured and Drove the Indictment Through Repeated Fabrication.**

148.    As noted above, Patel met with federal investigators and prosecutors on at least twenty occasions in connection with the investigation that resulted in Plaintiff's indictment.

149.    During those meetings, Patel provided detailed allegations of unlawful agreements involving Plaintiff.

150.    Patel's accusations were presented to the grand jury and formed a central component of the evidentiary basis for the indictment.

151.    Over the course of her repeated meetings with prosecutors, Patel's account expanded and became increasingly specific in ways that more directly implicated Plaintiff in alleged conspiratorial conduct.

152.    These escalating allegations were not supported by contemporaneous documents, independent corroboration, or objective evidence.

153.    Patel knew that the agreements she described did not occur.

154.    Patel knew she lacked pricing authority and had no capacity to enter into any price-fixing agreement with Plaintiff.

155.    Despite that knowledge, she repeated and refined those accusations in successive meetings with prosecutors.

156.    Patel understood that prosecutors would rely on her statements in deciding whether to seek an indictment and in presenting the case to the grand jury. She intended that reliance.

157.    Patel's accusations were material to the charging decision.

158.    Absent Patel's fabricated allegations, there would have been no sufficient evidentiary basis to indict Plaintiff.

159.    Patel therefore procured and initiated the criminal prosecution through knowingly false statements made with the intent that Plaintiff be indicted. While Patel fabricated allegations concerning multiple products, the most significant and illustrative falsehoods are set forth below.

**Patel's Lies About Adapalene**

160.    Patel claimed that Plaintiff coordinated with her to increase prices for adapalene gel, disclosed non-public pricing information before public announcement, and sought Teva's agreement to follow Taro's price increases.

161.    That accusation is an outright fabrication.

162.    Plaintiff never agreed with Patel to coordinate adapalene pricing.

163.    Plaintiff never provided Patel with non-public adapalene pricing prior to public announcement.

164.    Plaintiff never sought or obtained any agreement from Teva regarding the timing or amount of adapalene price increases.

165.    Any communications concerning Adapalene occurred only after pricing was publicly announced and involved routine market intelligence.

166.    Taro's Adapalene pricing decisions were made independently based on objective market data, including Intercontinental Medical Statistics data and Wholesale Acquisition Cost benchmarks.

167.    Those pricing decisions required internal approval from senior management, including the Chief Commercial Officer, Chief Financial Officer, Chief Executive Officer, and parent company executives.

**Patel's Lies About Clotrimazole**

168.    Patel claimed that Plaintiff informed her in advance of intended clotrimazole price increases and sought Teva's agreement to maintain those increases, and that Teva agreed not to bid to supply a Taro customer.

169.    That claim is categorically false.

170.    Plaintiff never disclosed non-public clotrimazole pricing intentions prior to public announcement.

171.    Plaintiff never sought any agreement from Teva regarding clotrimazole pricing or customer allocation.

172.    Plaintiff had no involvement in any agreement for Teva to refrain from bidding to any customer.

173.    Taro's clotrimazole pricing was determined independently using objective market data, including IMS data and WAC benchmarks.

174.    Teva made its own independent pricing decisions through its internal approval processes.

**Patel's Lies About Etodolac**

175.    Patel also claimed that Plaintiff and she agreed in 2013 to increase etodolac prices, identified specific non-public prices, circulated spreadsheets reflecting agreed-upon WAC prices, and implemented coordinated increases.

176.    That claim is completely false.

177.    Plaintiff never discussed or agreed with Patel to increase etodolac prices.

178.    Plaintiff never identified or disclosed specific non-public etodolac pricing to Patel.

179.    Plaintiff never circulated spreadsheets containing agreed-upon prices with any competitor.

180.    Taro's etodolac pricing timing and amounts were determined internally through business analysis, including market data, competitor counts, reference brand pricing, and financial modeling.

181.    All etodolac pricing decisions required internal senior management approval.

182.    At the time, Taro and Teva were the only suppliers of etodolac extended release, and pricing decisions were made independently based on market conditions.

**Patel's Complete About-Face in MDL Civil Proceedings.**

183.    In subsequent Multidistrict Litigation ("MDL") civil proceedings pending in the Eastern District of Pennsylvania, Patel reversed her prior account.

184.    In her MDL deposition testimony, Patel admitted that there was no price-fixing agreement.

185.    That admission was directly inconsistent with the allegations she provided to federal prosecutors during at least twenty meetings in the criminal investigation.

186.    In the criminal investigation, Patel described agreements involving Plaintiff concerning adapalene, clotrimazole, and etodolac. In the MDL proceedings, she denied the existence of such agreements.

187.    This was not a minor clarification or refinement. It was a complete about-face.

188.    In the MDL, Sandoz cooperating witness Michael Vezza testified that he had reached agreements with Patel.

189.    Patel denied reaching any such agreements.

190.    Her denial of agreements in civil proceedings directly contradicted the conspiracy narrative she had advanced during the criminal investigation.

191.    The only consistent explanation for these diametrically opposed accounts is that Patel's earlier claims were fabricated.

192.    If the alleged agreements had actually occurred, Patel would not have denied their existence under oath in subsequent civil proceedings.

**Patel's False Claims Were Contradicted by Other Witnesses and Objective Market Conduct**

193.    Patel's testimony was contradicted by several other witnesses.

194.    Multiple individuals denied the existence of the agreements Patel described and rejected any coordination with her.

195.    No witness confirmed the specific price-fixing or customer-allocation arrangements Patel claimed existed.

196.    Patel's narrative also conflicted with objective market behavior.

197.    She described coordinated pricing where the companies' actual conduct reflected independent competition.

198.    She attributed price increases to agreements that never occurred and claimed alignment where the market reflected undercutting, customer poaching, and competitive displacement.

199.    Her account was inconsistent with documentary records and the economic realities of how the products were priced and sold.

200.    In totality, the testimonial record, documentary evidence, and market conduct expose Patel's accusations as blatant fabrications.

## THE SANDOZ and KELLUM ALLEGATIONS

**Kellum Initiated and Drove the Criminal Prosecution**

201.    At all relevant times, Kellum was employed by Sandoz as Senior Director of Pricing and Contracts and later as Vice President of Contracting and Business Analytics.

202.    Plaintiff never met with or spoke to Kellum.

203.    Despite having no relationship with Plaintiff, Kellum became a central cooperating witness in the investigation that led to Plaintiff's indictment.

204.    At the outset of the investigation, Kellum denied the existence of any unlawful agreements and maintained that he believed he had acted appropriately.

205.    After facing the prospect of indictment, substantial prison exposure, and suspension or debarment from participation in federal healthcare programs, Kellum altered his account.

206.    Kellum began providing detailed allegations of price-fixing, customer allocation, and coordinated conduct involving Plaintiff.

207.    Kellum met repeatedly with federal prosecutors and refined his allegations over time.

208.    The scope and specificity of his accusations increased as the investigation progressed.

209.    Kellum understood that his cooperation bore directly on his own criminal exposure and potential sentencing outcome.

210.    He further understood that the perceived value of his testimony would influence the government's charging decisions.

211.    Kellum's accusations were presented to the grand jury and formed a substantial component of the case supporting Plaintiff's indictment.

212.    Kellum knew that the agreements he described did not occur.

213.    Despite that knowledge, he advanced those accusations in successive meetings with prosecutors.

214.    Kellum acted with the intent that his accusations would induce the government to indict Plaintiff.

215.    Without Kellum's allegations, there would have been no sufficient evidentiary basis to charge Plaintiff.

216.    Kellum's cooperation diverted investigative focus away from his own potential liability and toward Plaintiff.

217.    On February 14, 2020, Kellum pled guilty to conspiracy to restrain trade, an offense carrying a statutory maximum sentence of ten years' imprisonment and a $1 million fine.

218.    He received a sentence of one year of probation and a $20,000 fine.

219.    He did not serve a single day in jail.

220.    He was not suspended or debarred from federal healthcare programs and remains employed in the pharmaceutical industry.

221.    Kellum's lenient outcome followed his cooperation and false testimony against Plaintiff.

222.    Kellum understood that delivering a significant target would enhance the perceived value of his cooperation and improve his own outcome.

223.    He therefore supplied and maintained patently false accusations in order to secure the most favorable treatment possible.

224.    Kellum was not a passive witness responding to questioning. He was a knowing and active participant in initiating and advancing the prosecution against Plaintiff.

225.    His fabricated accusations were a direct moving force behind the initiation and continuation of the criminal proceeding.

**Kellum's Fabricated Allegations**

226.    On March 2, 2020, Sandoz entered into a Deferred Prosecution Agreement in this District.

227.    As part of that agreement, Sandoz adopted a Statement of Facts describing alleged anticompetitive conduct involving Plaintiff.

228.    Each allegation in the Sandoz DPA concerning Plaintiff is categorically false.

229.    Those allegations were based on Kellum's fabricated claims and false testimony.

**Kellum's Lies Regarding Clobetasol**

230.    Kellum falsely told investigators that Plaintiff coordinated with Sandoz to raise or stabilize clobetasol prices.

231.    He falsely claimed there were agreements to allocate customers, rig bids, and fix prices across clobetasol formulations, including cream, emollient cream, gel, ointment, and solution.

232.    He falsely claimed Plaintiff provided Taro's dead net clobetasol pricing by class of trade.

233.    He falsely claimed he used Plaintiff's supposed pricing information to align Sandoz's prices with Taro.

234.    He falsely claimed Plaintiff asked Sandoz not to compete for the VA clobetasol contract and disclosed Taro's intended bid pricing.

235.    These accusations were fabricated.

236.    Plaintiff never met with or spoke to Kellum.

237.    Plaintiff never agreed to allocate customers, rig bids, or fix clobetasol prices.

238.    Plaintiff never provided non-public bid prices or dead net pricing as part of any unlawful agreement.

239.    Any pricing information referenced in the marketplace was publicly available or customer-derived market intelligence.

240.    Taro's clobetasol pricing decisions were made internally using objective market data, including IMS data and WAC benchmarks, and required multi-level executive approval.

241.    Sandoz made its own independent pricing decisions through its own internal processes.

242.    Kellum falsely claimed "direct knowledge" of conversations that never occurred.

243.    Throughout his cooperation, Kellum offered shifting and inconsistent explanations regarding clobetasol, reflecting fabrication rather than recollection.

**Kellum's Lies Regarding Lidocaine Ointment.**

244.    Kellum falsely told investigators that Plaintiff agreed to allocate customers for lidocaine ointment.

245.    Kellum claimed there were coordinated discussions concerning Taro's relaunch and customer targeting.

246.    That allegation was patently false.

247.    In subsequent civil deposition testimony, Kellum admitted there was no lidocaine agreement with Taro.

248.    He testified that he would have known of any such agreement because lidocaine was a significant product for Sandoz and within his direct oversight.

249.    Taro independently relaunched lidocaine and pursued its prior customers as part of a competitive strategy.

250.    Sandoz had no involvement whatsoever in Taro's relaunch decisions.

251.    Kellum's later sworn admissions confirm that his prior accusations regarding lidocaine were false.

**Kellum's Lies Regarding Nystatin Triamcinolone Cream**

252.    Kellum falsely told investigators that Plaintiff agreed to allocate customers or stabilize prices for nystatin triamcinolone cream.

253.    He claimed Sandoz was to receive an agreed-upon market share from Taro.

254.    Those claims were completely fabricated.

255.    In reality, Sandoz launched a competing product without notice and aggressively targeted Taro's largest customer, Walgreens.

256.    Sandoz undercut Taro's pricing and secured exclusive arrangements that prevented Taro from responding.

257.    Walgreens was Taro's largest customer for the product, and Sandoz's actions caused Taro to lose that account.

258.    This competitive undercutting and displacement is irreconcilable with any alleged customer-allocation or price-fixing agreement.

259.    Kellum knew of this competitive conduct but deliberately concealed it from prosecutors.

260.    He instead supplied a fabricated narrative of coordination that the marketplace itself disproves.

261.    In later deposition testimony, Kellum admitted there was no NT cream agreement and that Sandoz was surprised by the launch dynamics.

262.    The actual market conduct flatly contradicts the conspiracy narrative Kellum advanced to federal prosecutors.

**Kellum's Initial Denials and Subsequent Fabrications**

263.    On February 14, 2020, Kellum pleaded guilty to conspiracy to restrain trade.

264.    The factual basis for his plea included extensive allegations concerning Plaintiff.

265.    Those allegations were not Kellum's original position.

266.    From October 2018 through January 2019, Kellum repeatedly denied participating in any unlawful agreements and maintained that he believed his conduct was lawful.

267.    He explained that following competitor price increases was a revenue strategy to avoid price erosion, not the result of any agreement.

268.    He maintained that independent parallel conduct could produce similar market outcomes without constituting an antitrust violation.

269.    He denied entering into any customer-allocation or price-fixing agreements.

270.    During this period, Kellum represented that he was being truthful and cooperative.

271.    Federal authorities rejected those denials and indicated that the evidence they were developing contradicted his account.

272.    Kellum was informed that the government was prepared to move forward toward indictment.

273.    The prospect of indictment, significant prison exposure, and the risk of suspension or debarment from participation in federal healthcare programs placed substantial pressure on Kellum.

274.    Kellum was aware that suspension or debarment would effectively end his career in the pharmaceutical industry.

275.    Rather than maintain his denials and proceed to trial, Kellum changed course.

276.    He adopted a narrative consistent with the government's theory and began providing allegations of unlawful agreements involving Plaintiff.

277.    Kellum's later statements conflicted with his earlier denials.

278.    His plea incorporated accusations he had previously rejected.

279.    Kellum's shift was not the product of newly discovered evidence; it followed mounting prosecutorial pressure and the looming consequences of indictment.

280.    He made a calculated decision to align his testimony with the government's expectations in order to secure favorable treatment.

281.    Kellum's plea agreement and cooperation followed that shift.

282.    He ultimately received an extraordinarily lenient sentence relative to the statutory maximum.

283.    He avoided suspension or debarment and continues to work in the pharmaceutical industry.

284.    Kellum's decision to abandon his initial denials and provide inculpatory allegations against Plaintiff was voluntary, strategic, and designed to protect his own interests.

**Kellum's Later Contradictory Testimony**

285.    In subsequent civil proceedings, Kellum provided sworn testimony that materially conflicted with the narrative reflected in his plea and earlier cooperation.

286.    In that later testimony, he retreated from, qualified, or contradicted prior allegations of unlawful agreements.

287.    His sworn statements were irreconcilable with the version of events he had previously provided to federal prosecutors.

288.    These contradictions expose that his prior accusations were not truthful accounts of actual events.

289.    Kellum's allegations were also inconsistent with objective market behavior.

290.    He described coordinated conduct where the marketplace reflected active competition.

291.    He attributed pricing movements to agreements that lacked reliable evidentiary support.

292.    His narrative was unsupported by contemporaneous documentation.

293.    Other witnesses did not corroborate the specific agreements he claimed existed.

294.    The record as a whole demonstrates that Kellum's accusations were false and misleading, and were manufactured to support the prosecution's fictional price-fixing claims.

## ALLEGATIONS COMMON TO ALL DEFENDANTS

**Defendants Acted Jointly with Law Enforcement to Fabricate Evidence and Prosecute Plaintiff**

295.    Patel and Kellum were not passive witnesses. They became active participants in the investigative and prosecutorial process.

296.    Over an extended period, they met repeatedly with federal prosecutors and investigators and provided detailed accusations against Plaintiff.

297.    Their allegations expanded and hardened as the investigation progressed and were relied upon in charging decisions.

298.    They understood that their statements would be used to seek and sustain an indictment.

299.    The government adopted and relied upon the narrative supplied by Patel and Kellum in presenting the case to the grand jury and maintaining the prosecution.

300.    Patel and Kellum knowingly supplied fabricated allegations with the intent that they be used as prosecutorial evidence.

301.    They continued to maintain those allegations throughout the criminal prosecution, knowing that their cooperation was central to the government's case.

302.    In jointly participating with law enforcement in supplying and sustaining fabricated evidence, and in encouraging prosecutors to go after Plaintiff to deflect attention away from themselves and ensure greater leniency, Patel and Kellum were willful participants in state action.

303.    Their conduct was a substantial factor in initiating and maintaining the criminal prosecution against Plaintiff.

304.    Through that joint participation, they acted under color of law and are liable for the constitutional injuries that resulted.

**The Criminal Indictment Based on Fabricated Testimony**

305.    On February 4, 2020, a federal grand jury returned an indictment charging Plaintiff with violations of the Sherman Act.

306.    The indictment was based on the false testimony and fabricated allegations provided by Patel and Kellum.

307.    Count One alleged a conspiracy involving Sandoz and was premised on Kellum's accusations.

308.    Count Two alleged a conspiracy involving Teva and was premised on Patel's accusations.

309.     The indictment alleged that Plaintiff agreed to allocate customers, shared non-public pricing information, coordinated the timing and amount of price increases, and declined to bid pursuant to unlawful agreements.

310.     Every one of those allegations was a fabrication.

311.     Plaintiff never entered into any agreement to fix prices or allocate customers.

312.     Plaintiff never disclosed non-public pricing as part of any unlawful arrangement.

313.     Taro's pricing decisions were made internally pursuant to established business processes and market analysis.

314.     There were no unlawful agreements, express or implied.

**Parallel Civil Litigation Based on the Same Fabrications**

315.     The same fabricated allegations formed the basis for extensive civil antitrust litigation against Plaintiff.

316.     Plaintiff was named as a defendant in multidistrict litigation pending in the Eastern District of Pennsylvania and in related actions brought by state attorneys general.

317.     Those civil claims relied on the same narrative supplied by Patel and Kellum in the criminal investigation.

318.     Plaintiff was subjected to sweeping discovery, depositions, motion practice, and exposure to massive financial claims as a result.

319.     Patel and Kellum understood that their accusations would have consequences beyond the criminal case.

320.     They nevertheless persisted in their fabricated allegations because doing so served their own interests and the interests of their employers.

321.    As a direct result of these fabricated accusations, Plaintiff has suffered severe reputational harm, substantial legal expense, and ongoing damage.

**Absence of Corroborating Evidence.**

322.    The testimony of Patel and Kellum is unsupported by any corroborating documentary or physical evidence.

323.    There are no emails, texts, written agreements, recordings, internal memoranda, calendar entries, business records, or third-party witness statements documenting any alleged unlawful agreement.

324.    No contemporaneous documents reflect customer allocation, coordinated pricing, or bid rigging involving Plaintiff.

325.    The complete absence of corroborating evidence underscores that the alleged conspiracy did not exist.

**The Criminal Case Collapses and Is Dismissed With Prejudice**

326.    The criminal prosecution continued for nearly four years.

327.    Plaintiff maintained his innocence and refused to plead guilty.

328.    In 2023, the government moved to dismiss the indictment with prejudice.

329.    The government advised the Court that the charges were no longer readily provable, citing impeachment information and other developments affecting key cooperating witnesses, including Patel and Kellum.

330.    The government's case unraveled as its central witnesses were exposed for delivering shifting, internally inconsistent, and irreconcilable accounts.

331.    On November 29, 2023, the Court dismissed the indictment with prejudice.

332.    The dismissal constituted a final termination in Plaintiff's favor.

**Career Destruction and Massive Economic Harm**

333.    As a direct and proximate result of the fabricated accusations and malicious prosecution, Plaintiff lost his career in the pharmaceutical industry.

334.    Before the indictment, Plaintiff earned between approximately $857,000 and $2.89 million in the years preceding the charges.

335.    He was a senior executive with more than thirty years of industry experience and a record of substantial success.

336.    Since the indictment, Plaintiff has been unable to secure comparable employment.

337.    The public criminal charges and parallel civil litigation severely damaged his professional reputation.

338.    Prospective employers and business contacts have refused to engage with him once the indictment surfaced.

339.    Plaintiff has retained a forensic economist who has concluded, within a reasonable degree of economic certainty, that Plaintiff has sustained multi-million-dollar losses in lifetime earning capacity.

340.    The economic damage is extraordinary and ongoing.

341.    Plaintiff's reputation has been permanently harmed, and his prospects for meaningful reemployment in the pharmaceutical industry are minimal.

342.    Public reporting of the indictment and civil allegations continues to follow Plaintiff and impair his professional standing.

343.    For all practical purposes, Plaintiff has been effectively excluded from the industry in which he built his career.

344.

**Emotional and Psychological Damages**

345.   As a direct and proximate result of Defendants' fabricated accusations and malicious prosecution, Plaintiff continues to suffer substantial emotional harm and ongoing injury.

346.   Plaintiff has sustained severe psychological injuries, including major depressive disorder, generalized anxiety, and post-traumatic stress.

347.   He has experienced significant social withdrawal, persistent anxiety, and pervasive distrust following the public accusations and betrayal by former industry colleagues.

348.   The destruction of his career caused a profound loss of professional identity and purpose, as his work in the pharmaceutical industry was central to his life and self-definition.

349.   Plaintiff has endured humiliation, guilt, shame, and a marked impairment in his ability to engage in normal professional and personal activities.

350.   His professional and personal reputation have been severely and permanently damaged.

351.   Plaintiff has incurred substantial economic losses and continues to suffer harm from the ongoing public record of the false accusations and parallel civil proceedings.

<u>**FIRST CAUSE OF ACTION**</u>
**Malicious Prosecution Under Pennsylvania Law**
*(Defendants Patel and Kellum)*

**Defendants Patel and Kellum Actively Instigated and Procured the Prosecution**

352.   Plaintiff repeats and realleges all prior allegations as if fully set forth herein.

353.   Patel and Kellum did not merely provide information to law enforcement and step aside. They actively instigated, encouraged, and propelled the criminal prosecution against Plaintiff.

354.    Facing their own criminal exposure, both Defendants understood that their personal protection depended on demonstrating value to prosecutors by delivering a significant target. They identified Plaintiff as that target.

355.    Patel and Kellum repeatedly met with federal prosecutors and investigators and supplied detailed accusations designed to portray Plaintiff as a central conspirator.

356.    They refined, expanded, and hardened those accusations over time to align with the government's developing theory.

357.    They pressed forward with inculpatory allegations knowing that prosecutors would rely upon them in seeking charges. They understood that absent their accusations, there was no case against Plaintiff.

358.    They knew their statements would be presented to a federal grand jury and used to obtain an indictment. They intended that result.

359.    Federal prosecutors relied on the fabricated framework provided by Patel and Kellum in seeking and securing the indictment.

360.    Without Patel's and Kellum's deliberate and sustained efforts to accuse Plaintiff, no criminal charges would have been filed.

361.    Patel and Kellum were instrumental, indispensable, and the direct moving force behind the initiation and continuation of the prosecution.

**Probable Cause Was Manufactured Through Deliberate Fabrication**

362.    There was no probable cause to initiate or continue the criminal prosecution against Plaintiff.

363.    The indictment rested on fabricated evidence and false testimony deliberately supplied by Patel and Kellum.

364.    Federal prosecutors relied on Patel's and Kellum's false accusations in deciding to seek an indictment, in presenting the case to the grand jury, and in maintaining the prosecution for nearly four years.

365.    Although an indictment ordinarily creates a presumption of probable cause, that presumption collapses where the indictment is procured through material misrepresentations, fabricated testimony, deliberate omissions, and bad-faith manipulation of evidence.

366.    That is precisely what occurred here.

367.    Patel and Kellum knowingly provided false testimony to federal prosecutors and, upon information and belief, to the grand jury.

368.    They abandoned prior truthful denials, embellished their accounts, added alleged conversations that never occurred, and supplied increasingly detailed accusations only after securing cooperation agreements that protected them from prison, catastrophic financial exposure, and professional destruction.

369.    Their stories did not merely evolve. They were constructed.

370.    Patel and Kellum adjusted their narratives to match the government's developing theory, adding inculpatory detail necessary to transform lawful competitive conduct into the appearance of criminal agreement.

371.    They withheld exculpatory information, concealed prior inconsistent statements, and presented prosecutors with a fabricated narrative designed to induce charges.

372.    Prosecutors relied on those fabrications. Without Patel's and Kellum's accusations, there was no case to bring.

373.    There were no corroborating emails, no recordings, no written agreements, no contemporaneous business records, and no independent documentary proof of any unlawful agreement.

374.    The prosecution stood entirely on the word of two cooperating witnesses with overwhelming incentives to lie and who shaped their accounts to demonstrate value and secure leniency.

375.    The only "evidence" of price fixing consisted solely of testimony from two witnesses who originally told investigators there were no agreements (in Kellum's case) or drastically changed their story (in Patel's case), then fabricated detailed accusations only after securing immunity deals worth millions of dollars and freedom from imprisonment.

376.    When probable cause depends entirely on knowingly false testimony supplied by self-interested cooperators, it is no probable cause at all.

377.    Once Patel's and Kellum's fabricated claims are stripped away, the evidentiary record is empty. No reasonable grand jury would have returned an indictment based on truthful evidence.

378.    The government ultimately moved to dismiss the indictment with prejudice after impeachment information severely undermined the credibility of its key cooperating witnesses.

379.    The government's motion to dismiss all charges, by itself, confirms the complete lack of probable cause to institute these proceedings in the first instance.

380.    Moreover, the collapse of the prosecution confirms what was true from the outset: the indictment was procured through fabricated testimony supplied by Patel and Kellum and relied upon by prosecutors.

381.    The presumption arising from the indictment is therefore obliterated. Patel's and Kellum's accusations were deliberate falsehoods manufactured to create probable cause where none existed.

**Patel and Kellum Acted with Actual Malice**

382.    Patel and Kellum commenced and continued the criminal prosecution of Plaintiff with actual malice.

383.    They did not make a mistake. They did not misremember. They fabricated.

384.    The absence of probable cause in this case is not merely technical. It is overwhelming—and from that absence, malice is not just inferable, it is unavoidable.

385.    The prosecution rested entirely on the uncorroborated word of two cooperating witnesses who faced prison, catastrophic financial exposure, and professional ruin, and who secured extraordinary benefits only after supplying incriminating testimony against Plaintiff.

386.    Kellum originally told investigators there were no agreements. Patel later admitted in civil proceedings that there were no agreements. Both knew the truth.

387.    Despite that knowledge, both reversed course and supplied detailed accusations that never occurred, because they understood that their freedom and financial survival depended on delivering a target.

388.    They knowingly accused an innocent man to save themselves. That is the essence of actual malice.

389.    Their stories did not simply "evolve." They hardened, expanded, and became more incriminating after repeated preparation sessions with prosecutors, as they absorbed cues, incorporated suggested themes, and added new alleged conversations and details that conveniently aligned with the government's theory.

390.    They abandoned prior truthful accounts and replaced them with increasingly elaborate fabrications designed to manufacture criminal exposure for Plaintiff.

391.    Patel met with prosecutors at least twenty times and steadily escalated her accusations as her cooperation progressed. Her later about-face in civil proceedings—where she admitted there were no agreements—confirms that her prior accusations were not mistaken recollections but deliberate falsehoods.

392.    Kellum likewise reversed his initial truthful denials and ultimately pleaded guilty only after sustained pressure, thereafter providing accusations that contradicted both objective market conduct and his own later sworn testimony.

393.    Both acted with a singular objective: protect themselves by delivering Plaintiff.

394.    They understood that the strength of the case against Plaintiff directly enhanced their own value, secured their immunity or leniency, protected them from prison, and preserved their careers.

395.    They chose self-preservation over truth.

396.    The deliberate manufacture of criminal accusations against a known innocent person, in exchange for personal benefit, constitutes actual malice in its purest form.

**Favorable Termination**

397.    The criminal prosecution against Plaintiff terminated decisively in his favor when, on November 29, 2023, the Court granted the government's motion to dismiss the indictment with prejudice.

398.    A dismissal with prejudice is not procedural housekeeping. It is a final, irrevocable termination on the merits. The government did not pause the case. It did not reserve the right to refile. It abandoned the prosecution permanently because it could not sustain it.

399.    The indictment that Patel and Kellum worked so aggressively to procure collapsed under the weight of its own defects. Once the credibility of the cooperating witnesses deteriorated and impeachment material surfaced, the case was no longer viable.

400.    The prosecution that Patel and Kellum instigated, fueled, and sustained for nearly four years ended not with a conviction, not with a plea, but with dismissal with prejudice — a complete vindication of Plaintiff.

401.    As a direct and proximate result of their malicious conduct, Plaintiff was forced to live for years under the cloud of federal felony charges carrying potential imprisonment, crippling fines, and permanent professional ruin.

402.    The indictment destroyed his career, decimated his reputation, and inflicted catastrophic, multi-million-dollar economic losses in present value.

403.    The damage was not collateral. It was the natural and foreseeable consequence of Patel and Kellum's deliberate fabrication of evidence and their calculated effort to secure an indictment at any cost.

404.    The prosecution they manufactured ended in total failure. The harm they caused did not.

405.    As a direct and proximate result of the malicious criminal prosecution by Patel and Kellum, Plaintiff sustained severe damages, including loss of liberty, destruction of his distinguished career, and substantial multi-million-dollar economic losses in present value.

## SECOND CAUSE OF ACTION
### Malicious Prosecution Under Pennsylvania Law
*(Teva Pharmaceuticals USA, Inc. and Sandoz Inc.)*

**Teva's Vicarious Liability**

406.    Plaintiff repeats and realleges each and every preceding paragraph of this Complaint as if fully set forth herein.

407.    Teva is vicariously liable for the malicious prosecution carried out by Patel.

408.    Patel's fabricated accusations concerned alleged conduct during her tenure at Teva and were based entirely on information she obtained through her corporate position. Her statements arose directly from, and were inseparable from, her employment responsibilities.

409.    Upon information and belief, Teva funded Patel's legal defense and agreed to defend and indemnify her throughout the criminal investigation and prosecution, thereby reinforcing and enabling the very conduct that led to Plaintiff's malicious prosecution.

410.    Patel's cooperation advanced Teva's corporate interests during negotiations with federal prosecutors and during the period in which Teva sought to resolve its own criminal exposure. Her accusations strengthened Teva's bargaining posture and demonstrated the employee cooperation prosecutors demanded.

411.    By resolving its case through a Deferred Prosecution Agreement rather than a conviction, Teva avoided the catastrophic consequence of mandatory exclusion from federal healthcare programs under 42 U.S.C. § 1320a-7. Patel's fabrication materially served that objective.

**Teva's Ratification of Patel's Conduct**

412.    Teva signed its Deferred Prosecution Agreement and adopted the Statement of Facts that incorporated and relied upon Patel's accusations against Plaintiff.

413.    By executing that agreement and accepting its benefits, Teva formally embraced the narrative Patel supplied.

414.    Teva never repudiated, corrected, or withdrew Patel's accusations — even after those accusations were exposed as false and even after Patel reversed course in civil proceedings.

415.    Teva cannot adopt fabricated accusations to secure leniency and avoid exclusion from government programs, then disavow those same accusations when they give rise to civil liability. Its ratification was knowing and deliberate.

416.    As a direct and proximate result of Patel's malicious prosecution, for which Teva is responsible under principles of respondeat superior and ratification, Plaintiff suffered loss of liberty, destruction of his executive career, and substantial multi-million-dollar damages.

**Sandoz's Vicarious Liability**

417.    Plaintiff repeats and realleges each and every preceding paragraph of this Complaint as if fully set forth herein.

418.    Sandoz is vicariously liable for the malicious prosecution driven by its senior executive, Kellum.

419.    Kellum's fabricated accusations concerned pricing, contracting, and competitive conduct — matters squarely within the scope of his executive responsibilities at Sandoz.

420.    During negotiations with federal prosecutors and thereafter under its executed Deferred Prosecution Agreement, Kellum's cooperation directly advanced Sandoz's corporate interests by demonstrating employee cooperation and preserving the negotiated resolution of its own criminal exposure.

421.     By entering into its Deferred Prosecution Agreement, Sandoz avoided conviction and the existential risk of mandatory exclusion from federal healthcare programs under 42 U.S.C. § 1320a-7.

422.     Upon information and belief, Sandoz funded Kellum's legal defense and provided indemnification in connection with the investigation and prosecution, thereby reinforcing and enabling the very conduct that led to Plaintiff's malicious prosecution.

**Sandoz's Ratification of Kellum's Conduct.**

423.     Sandoz signed its Deferred Prosecution Agreement and adopted a Statement of Facts built upon Kellum's accusations.

424.     By doing so, Sandoz embraced and relied upon Kellum's narrative as part of its formal resolution with the government.

425.     Sandoz never disavowed or corrected Kellum's accusations, even after contradictions emerged and the criminal case collapsed.

426.     Having accepted the benefits of Kellum's conduct — avoidance of conviction, avoidance of exclusion, and preservation of corporate standing — Sandoz is liable for the harm that conduct caused.

427.     As a direct and proximate result of Kellum's malicious prosecution, for which Sandoz is responsible, Plaintiff suffered severe reputational damage, loss of liberty, and extraordinary economic loss.

## THIRD CAUSE OF ACTION
### Fabrication of Evidence in Violation of the Constitutional Right to a Fair Trial
*(42 U.S.C. § 1983 – Against All Defendants)*

428.     Plaintiff repeats and realleges each and every preceding paragraph as if fully set forth herein.

429.    Patel and Kellum knowingly and deliberately fabricated material evidence against Plaintiff and caused that fabricated evidence to be transmitted to federal law enforcement officials and federal prosecutors for the purpose of securing his indictment and prosecution.

430.    They invented agreements that never occurred, fabricated conversations that never took place, falsely attributed authority and conduct to Plaintiff, and deliberately recast lawful competitive behavior as criminal collusion.

431.    Kellum initially denied the existence of any unlawful agreements. Patel later admitted under oath in civil proceedings that no such agreements existed. Despite knowing the truth, both reversed course and constructed detailed inculpatory narratives only after securing cooperation benefits that protected them from imprisonment, catastrophic financial exposure, debarment, and professional ruin.

432.    Patel and Kellum did not merely relay historical facts. They generated the only purported insider narrative of conspiracy. There were no recordings, no written agreements, no contemporaneous business records, and no independent documentary proof of any unlawful agreement. The prosecution depended entirely on their accounts.

433.    Over numerous meetings with federal prosecutors and investigators, Patel and Kellum refined, expanded, and adjusted their accusations. Their allegations grew in specificity and scope over time, supplying precisely the details necessary to transform lawful parallel conduct into the appearance of a criminal agreement.

434.    This was not passive cooperation. It was iterative fabrication undertaken with the understanding that prosecutors required a cohesive insider narrative in order to charge Plaintiff

435.    Federal prosecutors relied on Patel and Kellum as indispensable participants in constructing the case. Their accusations supplied the evidentiary core presented to the grand jury and formed the foundation of the indictment.

436.    Patel and Kellum understood that their statements would be used to initiate criminal charges. They intended that result. They acted with the specific purpose of influencing charging decisions and causing Plaintiff to be indicted.

437.    By knowingly fabricating evidence, repeatedly presenting that fabricated evidence for prosecutorial use, and collaborating in shaping a narrative intended for grand jury presentation and trial, Patel and Kellum became willful participants in joint activity with federal officials.

438.    Their conduct went beyond furnishing information. They knowingly participated in the creation, refinement, and deployment of false evidence designed to be used as prosecutorial proof. The indictment would not have issued without their fabricated narrative.

439.    When a private actor knowingly fabricates evidence and actively collaborates with law enforcement in presenting that fabrication for use in criminal proceedings, that actor functions as a joint participant in state action and acts under color of law within the meaning of 42 U.S.C. § 1983.

440.    The fabricated evidence was material and outcome-determinative. It was presented to the grand jury and relied upon to initiate and sustain the prosecution for nearly four years. Absent Patel's and Kellum's deliberate fabrications, no indictment would have been returned and no prosecution would have occurred.

441.    By intentionally creating and causing the use of fabricated evidence to deprive Plaintiff of liberty, Patel and Kellum violated Plaintiff's clearly established constitutional right to due process and to a fair trial.

442.    As a direct and proximate result of this constitutional violation, Plaintiff suffered loss of liberty, destruction of his executive career, severe reputational harm, emotional injury, and multi-million-dollar economic damages.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against defendants jointly and severally as follows: compensatory damages in an amount to be determined at trial, punitive damages in an amount to be determined at trial, pre-judgment and post-judgment interest as allowed by law, costs and attorneys' fees, and such other and further relief as the Court deems just and proper.

Dated: New York, New York
       February 23, 2026                              Respectfully submitted,

                                          **O'BRIEN COLEMAN & WRIGHT, LLC**

                          By:    *Alec B. Wright*          .
                                 Alec B. Wright, Esq.
                                 *Attorneys for Plaintiff*
                                 116 Blvd of the Allies
                                 Pittsburgh, Pennsylvania 15222
                                 Tel. No.: (412) 260-1662
                                 alec@ocwjustice.com

                                          **JON L. NORINSBERG, ESQ., PLLC**

                          By:    _____
                                 Jon L. Norinsberg, Esq.
                                 *Attorneys for Plaintiff*
                                 825 Third Ave., Suite 2100
                                 New York, New York 10022
                                 Tel. No.: (212) 791-5396
                                 jon@norinsberglaw.com